## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| STRIKE TAX ADVISORY LLC, and JONATHAN CARDELLA, | Case No. 1:23-cv-00177-BLW |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| DANIELLE WEST, | |
| Defendant. | |

### INTRODUCTION

Before the Court is Defendant Danielle West's Motion to Dismiss (Dkt. 6).
For the reasons explained below, the Court will grant the motion and dismiss this
case with prejudice.

### BACKGROUND

This is an employment dispute between an employer, Strike Tax Advisory
LLC ("Strike"), and its former employee, Danielle West.[1] Strike offers advisory
services to businesses by helping determine their eligibility for certain tax credits.

---

[1] Jonathan Cardella is also a plaintiff in this case and a defendant in West's Colorado lawsuit. Cardella is a co-founder and the Chief Executive Officer of Strike. *Compl.* ¶ 5, Dkt. 1-3. Throughout this Order, the Court refers to both Strike Tax Advisory LLC and Jonathan Cardella, together, as "Strike."

**MEMORANDUM DECISION AND ORDER - 1**

*Compl.* ¶ 2, Dkt. 1-3. In November of 2017, Strike hired Danielle West as an Account Manager on its sales team. *Id.* ¶ 17. Her job was to sign clients who might be eligible for tax credits. *Id.* ¶ 13. Strike's tax credit team would then complete in-depth studies to determine whether those clients were, indeed, eligible. *Id.* ¶ 11.

Strike fired West on April 4, 2022, due to "performance issues, including one that nearly lost Strike a significant business relationship." *Id.* ¶ 21. After West's termination, a dispute arose over how much compensation she was entitled to receive. *Id.* ¶¶ 35–42. That dispute is the heart of this case.

Before digging into the details of the parties' disagreement, it is helpful to better understand Strike's business model and compensation structure. As noted, Strike's salespeople identify and sign clients who they believe are potentially eligible for certain tax credits. Then, to determine whether a client is, indeed, eligible, Strike's tax credit team completes an in-depth "tax-credit study" involving data collection and communications with the client. *Id.* ¶ 11. If the study reveals that the client is indeed eligible, Strike provides the client with the appropriate application forms and advises them how to apply for the tax credit. *Id.* In exchange, the client pays Strike a percentage of any tax credit or refund successfully obtained as a result of Strike's assistance. *Id.* The client may choose to make that payment (1) when the tax-credit study is complete, or later (2) when the

client receives their tax refund or credit. *Id.* ¶ 12. If the former, the amount is calculated as a percentage of the *anticipated* credit or refund, and if the latter, it is a percentage of the actual refund or credit received. *Id.*

Strike's salespeople receive a base wage and two kinds of additional payments: Fee Commissions ("Commissions") and Engagement Letter Bonuses ("EL Bonuses"). Commissions are calculated as a percentage of the payments made by the clients each salesperson signs. *Id.* ¶ 13. According to Strike, a salesperson earns a Commission at the time that Strike actually *collects* payments from a client—not at the time a client is retained. *Id.* ¶ 13–14. The other kind of payment that salespeople receive, EL Bonuses, are simply advances on Commissions. *Id.* ¶ 15. These are earned when a salesperson initially signs a client and obtains the documentation necessary for Strike to begin the tax-credit study. *Id.* ¶ 15.

Now, back to what happened in this case. At the time West was fired in April of 2022, she had received a total of seventeen EL Bonuses, because she had signed seventeen clients. *Id.* ¶ 22. But only one of those seventeen clients had, at that point, paid Strike. *Id.* ¶ 23. Accordingly, Strike determined that West was only entitled to one Commission. *Id.* ¶ 23.

When she did not receive commissions for the other clients she had signed,

**MEMORANDUM DECISION AND ORDER - 3**

West sent Strike a demand letter seeking "immediate payment . . . of all of the commissions she earned through the deals she closed during her employment with Strike." *Demand Letter* at 2, Dkt. 6-2. The letter also requested an "itemized earning statement" detailing all "(a) deals closed by West during the course of her employment, (b) income received by Strike pursuant to the deals, (c) wages and compensation paid to West, and (d) deductions Strike made to West's wages and compensation." *Compl.* ¶ 27, Dkt. 1-3.

Strike responded two weeks later by (1) providing the "comprehensive accounting" West had requested and (2) offering a $1,000 check "as full and complete payment of all debt owed to West." *Id.* ¶ 28–29. In its letter, Strike maintained the position that West was only entitled to one Commission of $111.20. *Id.* ¶ 29. It offered the settlement "solely to avoid having to waste its resources defending West's claims any further." *Id.* ¶ 29. Strike also advised West that, if she filed a lawsuit to collect the unpaid Commissions, Strike would counterclaim for repayment of a separate $2,600 advance that West had previously received. *Id.* ¶ 30.

West rejected Strike's settlement offer and, on March 10, 2023, informed Strike that she intended to file a complaint in the U.S. District Court for the District of Colorado the following week. *Id.* ¶ 31. West included a copy of her draft

**MEMORANDUM DECISION AND ORDER - 4**

complaint, which alleged wage theft and retaliation in violation of the Colorado

Wage Act (CWA), C.R.S. § 8-4-101 *et seq.*.

On March 12, 2023, two days after receiving West's notice of intent to file

suit, Strike filed its own complaint seeking declaratory relief in Idaho state court.

*Compl.*, Dkt. 1-3. West promptly removed the case to federal court. *Notice of*

*Removal*, Dkt. 1. In this lawsuit, Strike seeks declaratory judgments establishing

that: (a) the amount of compensation Strike owes West "is dictated by the

Employment Agreement negotiated by" the parties; (b) "Strike does not owe West

more than $1,000 for compensation earned during the course of her employment

with Strike;" and (c) "Strike did not retaliate against West under the CWA." *Id.* at

9.

Instead of answering Strike's Complaint, West filed a Motion to Dismiss

Pursuant to Colorado Anti-SLAPP Law and Federal Rule of Civil Procedure

12(b)(6). *Motion*, Dkt. 6. That motion has been fully briefed and is ready for a

decision.

## LEGAL STANDARD

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), a

complaint "must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In making

that determination, a court must accept as true all factual allegations in the

complaint and construe them in the light most favorable to the plaintiff. *Watison v.*

*Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012).

Moreover, West believes an additional standard for dismissal applies in this

case. Colorado's Anti-SLAPP law, C.R.S. § 13-20-1101, *et seq.*, requires the

dismissal of certain complaints even if they clear the threshold demands of Rule

12(b)(6). [2] The Anti-SLAPP law provides:

> A cause of action against a person arising from any act of that person
> in furtherance of the person's right of petition or free speech under the
> United States constitution or the state constitution in connection with
> a public issue is subject to a special motion to dismiss unless the court
> determines that the plaintiff has established that there is a reasonable
> likelihood that the plaintiff will prevail on the claim.

C.R.S. § 13-20-1101(3)(a). That statute goes on to provide a non-exhaustive

list of acts that are considered to be "in furtherance of a person's right of

petition or free speech," including a catchall for "[a]ny other conduct or

---

[2] The parties agree that Colorado's Anti-SLAPP law applies in this case, and in federal court more generally. *See Def.'s Memo. in Supp.* at 4, Dkt. 6-1; *Def.'s Resp.* at 3–5, Dkt. 9; *see also Moreau v. United States Olympic & Paralympic Committee*, 2022 WL 17081329, at *6 (D. Colo. Nov. 18, 2022) (citing *Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Mee. Progress*, 890 F.3d 828, 833-34 (9th Cir. 2018)) ("Colorado's anti-SLAPP law is applicable in federal court.").

communication in furtherance of the exercise of a constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." C.R.S. § 13-20-1101(2)(a)(IV).

## ANALYSIS

West first argues that Strike's Complaint should be dismissed under Colorado's Anti-SLAPP law because it was filed "to prevent [her] from exercising her right to file a lawsuit under the Colorado Wage Act." *Def.'s Memo. in Supp.* at 2, Dkt. 6-1. Moreover, she explains, Strike has not identified any "cognizable legal theory" as the basis for its lawsuit. Strike responds, first, that the Anti-SLAPP law does not apply in this case for various reasons. Moreover, Strike explains, Idaho's Declaratory Judgment Act (IDJA) provides a sufficient legal basis for this lawsuit.

Strike is correct on both points. The Anti-SLAPP law does not apply because Strike's cause of action does not arise from West's exercise of a constitutional right of petition or speech. Further, the IDJA does provide a valid legal basis for Strike's lawsuit because Strike's rights and obligations are disputed under the terms of the employment contract and the CWA. Nevertheless, the Court will dismiss Strike's lawsuit under its inherent authority to administer its docket and avoid duplicative litigation.

## 1.    Colorado's Anti-SLAPP law does not apply.

Courts analyze Anti-SLAPP motions to dismiss in two steps. *See generally L.S.S. v. S.A.P.*, 523 P.3d 1280, 1285–89 (Colo. App. 2022). First, the court determines whether the movant has shown that the Anti-SLAPP law applies. *Id.* And second, if the law does apply, the Court determines whether the non-movant has demonstrated a reasonable likelihood of success on its claim. *Id.*

West argues that the Anti-SLAPP law applies because Strike filed this lawsuit "in response" to her own threatened litigation in Colorado. *Def.'s Memo. in Supp.* at 2, Dkt. 6-1. Accordingly, she explains, this action "ar[ose] from" an act "in furtherance of" her right to petition the government—that is, the act of threatening to file a lawsuit in federal court. C.R.S. § 13-20-1101(3)(a). But Strike's subjective intention for filing its Complaint is not dispositive when it comes to the Anti-SLAPP law.[3] That law's applicability does not hinge on a plaintiff's subjective motivations. Rather, the law applies only when the plaintiff's "*cause of action*" arises from the defendant's exercise of rights. C.R.S. § 13-20-1101(3)(a) (emphasis added). Whatever Strike's reason for filing this lawsuit, it is

---

[3] This does not mean that a plaintiff's subjective motivations are *irrelevant* under Colorado's Anti-SLAPP law. Rather, the Court concludes only that subjective motivations are not *alone* enough to justify application of the Anti-SLAPP law when that law's threshold requirement is not satisfied—that is, when the plaintiff's *cause of action* is not related to the defendant's acts in furtherance of her speech and petition rights.

difficult to see how the declaratory relief it seeks bears on West's ability to seek redress in court.

The Colorado General Assembly enacted the Anti-SLAPP law "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, to protect the rights of persons to file meritorious lawsuits for demonstrable injury." C.R.S. § 13-20-1101(1)(b). "To that end, the statute creates a procedural mechanism that allows a district court to assess a lawsuit at its early stages" and "weed out lawsuits that are not being used to address a legal injury, but instead seek to dissuade another from exercising their First Amendment rights[]." *Creekside Endodontics, LLC v. Sullivan*, 527 P.3d 424, 429 (Colo. App. 2022).

In line with that purpose, Colorado courts have applied the Anti-SLAPP law in cases involving attempts by one party to prevent another party from seeking redress in court, *e.g. Salazar v. Public Trust Inst.*, 522 P.3d 242, 249 (Colo. App. 2022) (applying Anti-SLAPP law in malicious prosecution case), or speaking freely, *e.g. Creekside Endodontics, LLC*, 527 P.3d at 430 (applying Anti-SLAPP law in defamation case). Such causes of action arise from the defendants' acts of petition and speech and are therefore subject to the Anti-SLAPP law.

MEMORANDUM DECISION AND ORDER - 9

In contrast, Strike's Complaint seeks declaratory judgment as to its financial obligations under the employment contract and CWA. Thus, even though Strike apparently raced to file its Complaint before West could file her own, Strike's claims, themselves, have nothing to do with West's ability to file her own complaint. And indeed, West *did* subsequently file her own complaint in Colorado, despite Strike having already filed this one.

Colorado's Anti-SLAPP law does not apply, and the Court therefore need not proceed to the second step of assessing Strike's likelihood of success.

**2.      Idaho's Declaratory Judgment Act provides a valid basis for Strike's lawsuit.**

Next, West argues that Strike's Complaint fails even under the plain old Rule 12(b)(6) standard because "[n]either the CWA nor any other Colorado law permits an employer to sue its current or former employees" over compensation or retaliation disputes. *Def.'s Memo. in Supp.* at 6, Dkt. 6-1. But Strike does not rely on Colorado law as the basis for its lawsuit. Instead, it points to Idaho's Declaratory Judgment Act (IDJA), Idaho Code § 10-1201 *et seq.*, which provides:

> Any person interested under a deed, will, written contract or other writings constituting a contract or any oral contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

I.C. § 10-1202.

The question, then, is whether the IDJA—not the CWA—provides a sufficient basis for Strike's suit. West thinks not, quoting the Idaho Supreme Court's statement that the IDJA "does not relieve a party from showing that it has standing to bring the action in the first instance." *Groveland Water & Sewer, Dist. v. City of Blackfoot*, 505 P.3d 722, 728 (Idaho 2022). But this response falls short.

To have standing, a plaintiff must have suffered an injury in fact that was casually connected to the defendant's conduct, and that can be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). West argues that Strike has not demonstrated an injury in fact. *Def.'s Memo. in Supp.* at 5, Dkt. 6-1 ("The Employers in this case . . . did not suffer any injury[.]") But after her termination, West demanded payment of Commissions that Strike does not believe she is entitled to under the employment contract. That demand—and West's continued pursuit of the Commissions—gives Strike a sufficient stake in the outcome of this dispute to satisfy the injury-in-fact requirement.

The Idaho Supreme Court's analysis in *Valencia v. Saint Alphonsus Medical Center - Nampa, Inc.* is instructive. 470 P.3d 1206 (Idaho 2020).

**MEMORANDUM DECISION AND ORDER - 11**

There, patients disputed their hospital bills after receiving emergency medical care. *Id.* at 1208. When the hospital demanded payment of the bills, the patients filed a lawsuit under the IDJA seeking a declaration that the hospital was not entitled to the amount billed. *Id.* at 1208–09. Before dismissing the case on other grounds, the court held that the patients had satisfied the injury-in-fact requirement. *Id.* at 1211. The patients "need not 'wait until lawsuits against them [are] filed or collection agents beg[i]n harassing them or their credit files [are] red-flagged' to have standing.'" *Id.* (quoting *DiCarlo v. St. Mary's Hosp.*, 530 F.3d 255, 263 (3rd Cir. 2008)) (alterations in original). "[T]he potential injury—the billing—occurred when Patients had services rendered to them," and the patients therefore alleged a sufficient injury to bring suit under the IDJA. *Id.* at 1211.

Similarly, West sent a letter to Strike demanding payment of Commissions that she "conservatively estimate[d] . . . to be at least $150,000.00"—payments Strike does not believe West is entitled to. *Demand Letter* at 2, Dkt. 6-2. Like the patients in *Valencia*, Strike was not required to wait until West filed her lawsuit before it had standing to sue for declaratory relief under the IDJA. Its personal stake in the outcome of the dispute satisfies the injury-in-fact requirement.

MEMORANDUM DECISION AND ORDER - 12

Moreover, West has not provided any support for her assertion that the IDJA is not alone a sufficient legal basis for Strike's lawsuit. On the contrary, Idaho courts have entertained lawsuits arising from the IDJA, alone, without requiring plaintiffs to identify any other, independent causes of action. *See, e.g.*, *Winther v. Village of Weippe*, 430 P.2d 689, 692 (Idaho 1967) ("[A]lthough . . . an alternative statutory or common law action may lie, the trial court should not dismiss a declaratory judgment action on that ground alone.").

The Court will not dismiss Strike's Complaint under Colorado's Anti-SLAPP law or Rule 12(b)(6).

**3.    The Court will dismiss Strike's anticipatory lawsuit because it is duplicative of West's Colorado lawsuit.**

"As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Under the "first-to-file rule," federal courts sometimes stay or dismiss cases that duplicate—or are "substantially similar" to—cases previously filed in other federal courts. *Nakash v. Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989). The purpose of this rule is to "maximize 'economy, consistency, and

comity.'" *Kohn Law Group, Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015) (quoting *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 604 (5th Cir. 1999)).

But the first-to-file rule should not be applied mechanically. *See Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982). Indeed, under some circumstances, rigid deference to an earlier-filed lawsuit is entirely inappropriate. To address one such set of circumstances, courts have carved out an exception to the first-to-file rule for "anticipatory lawsuits." *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 628 (9th Cir. 1991) (citing *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 602 n.3 (5th Cir. 1983)).

The anticipatory suit exception applies when a plaintiff hurries to file a lawsuit after receiving "specific, concrete indications that a suit by the defendant is imminent." *Diversified Metal Products, Inc. v. Odom Industries, Inc.*, No. 1:12–cv–00162–BLW, 2012 WL 2872772, at *5 (D. Idaho July 12, 2012) (citing *Xoxide, Inc. v. Ford Motor Co.*, 448 F.Supp.2d 1188, 1192–93 (C.D. Cal. 2006)). In such cases, the anticipatory suit exception instructs against giving the first-filing party the benefit of the first-to-file rule. This exception is "rooted in a concern that a plaintiff should not

be 'deprived of its traditional choice of forum because a defendant with notice of an impending suit first files a declaratory relief action over the same issue in another forum.'" *Inherent.com v. Martindale-Hubbell*, 420 F.Supp.2d 1093, 1097 (N.D. Cal. 2006) (quoting *British Telecomm. v. McDonnell Douglas Corp.*, No. C–93–0677, 1993 WL 149860, at *3 (N.D. Cal. May 3, 1993)). Favoring the first-filed action in such cases would incentivize forum shopping and lead "the parties and courts into an awkward cart-before-the-horse litigation posture." *Kochava, Inc. v. FTC*, Case No. 2:22-cv-00349-BLW, 2023 WL 3250496, at *3 (D. Idaho May 3, 2023).

This is an anticipatory suit, filed because Strike knew West planned to file her own lawsuit in Colorado and it did not want to litigate in that forum. *See Compl.* ¶ 32, Dkt. 1-3; *Pl.'s Resp.* at 3, Dkt. 9. West gave "specific, concrete indications" that she would be filing a lawsuit, and Strike responded only two days later by racing to the courthouse with its own complaint. Tellingly, its claims for declaratory relief seek to prejudge the validity of its anticipated defenses to West's suit: each requested declaration neatly parallels one of West's own claims.

Proceeding with this case while the same parties litigate identical issues in Colorado's federal court would harm, not maximize, "economy,

consistency, and comity." *Kohn Law Group, Inc.*, 787 F.3d at 1240; *see also Colorado River Water Conservation Dist.*, 424 U.S. at 817 ("As between federal district courts, . . . though no precise rule has evolved, the general principle is to avoid duplicative litigation."). Though Strike filed its Complaint first, it did so in anticipation of West's own impending action in Colorado and for the express purpose of choosing its preferred forum. *Pl.'s Resp.* at 1, Dkt. 9 ("Plaintiffs filed this suit . . . rather than allowing West to drag them into a Colorado lawsuit.").

The Court will therefore dismiss Strike's case pursuant to the Court's inherent authority to administer its docket, avoid duplicative litigation, and conserve judicial resources.

## ORDER

**IT IS ORDERED that** Defendant's Motion to Dismiss (Dkt. 6) is **GRANTED**. The Complaint (Dkt. 1-3) is **DISMISSED without prejudice** and the Clerk of Court is directed to close this case.

DATED: September 1, 2023

B. Lynn Winmill
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 16